IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-01661-LTB-CBS

RUSSELL M. BOLES,
     Plaintiff,
v.

RICHARD DANSDILL,
LT. CHARLES PEOPLES,
TOM MALLARY,
TIMOTHY CREANY, and
MICHAEL S. WALSH,
     Defendants.[1]

_____

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

Magistrate Judge Craig B. Shaffer

     This civil action comes before the court on Defendants' Motion for Summary Judgment (filed June 2, 2008) (doc. # 157). Pursuant to the Order of Reference dated October 20, 2006 (doc. # 58) and the memorandum dated June 3, 2008 (doc. # 158), this matter was referred to the Magistrate Judge. The court has reviewed the Motion, Mr. Boles' Response (filed August 20, 2008) (doc. # 168), the exhibits and affidavits, including Mr. Boles' supplement (doc. # 169 at pp. 2-20 and doc. #169-2) and Mr. Boles' affidavit (doc. # 179-2),[2] and the applicable law and is sufficiently advised in the premises.

I.    Statement of the Case

     Mr. Boles is currently incarcerated at the Sterling Correctional Facility in Sterling, Colorado. In the Second Amended Complaint ("SAC" (doc. # 30)), Mr. Boles alleges that he suffers from various medical conditions, including hypoglycemia, sleep apnea, irritable

_____

[1]    The court previously dismissed all claims against Defendants Masterson and DeCesaro.

[2]    On October 2, 2008, the court resolved Mr. Boles' contention regarding alleged "missing documents and other evidence." (*See* doc. # 181).

bowel syndrome and allergies. (*See* SAC (doc. # 30) at p. 12 of 15).[3] At all times relevant to his claims, Mr. Boles was incarcerated at Fremont Correctional Facility ("FCF") in Canon City, Colorado. Mr. Boles alleges pursuant to 42 U.S.C. § 1983 that Defendants' failure to provide adequate medical treatment and an appropriate diet while he was housed at FCF in 2004 and 2005 resulted in violations of his First Amendment and Eighth Amendment rights.

Mr. Boles' First Claim for Relief alleges violations of the First and Eighth Amendments of the U.S. Constitution by the remaining Defendants Dansdill, Peoples, Creany, and Mallary. Mr. Boles alleges he had been prescribed kosher therapeutic diet snacks to address his hypoglycemia and irritable bowel syndrome. Mr. Boles alleges that in April 2004 and May 2005, Defendant Peoples was the "senior officer in charge of Kosher food preparation at FCF and preparation of the plaintiff's prescribed snacks." (*See* SAC (doc. # 30) at p. 6 of 15). Mr. Boles alleges that in April 2004, Defendant Peoples prohibited FCF's kosher food preparation area from complying with Jewish dietary requirements which "causes the food . . . to be unfit or non-kosher for passover consumption." (*See id.* at p. 6 of 15). Mr. Boles also alleges that in April 2004 and May 2005, Defendant Peoples ordered kosher food preparers to deviate from Mr. Boles' prescribed therapeutic snack regime, which interfered with his medical treatment and made him physically ill. (*See* SAC (doc. # 30) at p. 6 of 15).

Mr. Boles further alleges that in February 2004, Defendant Dansdill, in his capacity as FCF's kitchen manager, threatened to have his kosher therapeutic snacks canceled in retaliation for his complaints about bad food and missing snacks. (*See* SAC (doc. # 30) at p. 5 of 15). Mr. Boles alleges that in April 2004, Defendant Dansdill gave Defendant Peoples approval to "act in a manner causing Kosher food to become non-kosher" and

---

[3] The court dismissed Claim Three of the Second Amended Complaint on September 20, 2007. (*See* "Order on Recommendation of Magistrate Judge entered May 29, 2007" (doc. # 125)).

"gave after-the-fact approval to Lt. Peoples' order that preparers deviate from the prescription for the plaintiff's snacks." (*See id.* at p. 5 of 15).  Also in April 2004, Defendant Dansdill allegedly conspired with Dr. Creany to cancel Mr. Boles' therapeutic snacks, thereby "impos[ing] excessive force which struck great fear in the plaintiff causing psychological as well as physical harm."  (*See* SAC (doc. # 30) at p. 6 of 15).  Mr. Boles alleges that Defendant Dansdill exceeded his authority by cancelling the prescribed snacks on April 28, 2004.  (*See id.* at p. 6 of 15).

Also in Claim One, Mr. Boles alleges that Defendant Creany, the chief physician at FCF, "conspired with Captain Dansdill to discontinue therapeutic diet snacks on non-medical grounds" and then, after the snacks were reinstated, "threatened several times to have them cancelled again." (*See* SAC (doc. # 30) at p. 8 of 15).  Mr. Boles contends that Defendant Creany violated his constitutional rights by allowing others to interfere with the "sound medical judgment" of the doctor and dietician who originally prescribed the snacks and refusing to make an informed judgment of his own, by "deliberately" ignoring or overlooking symptoms that should have been apparent to even a lay person, and by failing to inquire into "essential facts" or conduct an adequate examination. (*See* SAC (doc. # 30) at p. 8 of 15).  Mr. Boles claims that Defendant Creany "missed a very serious medical problem that would have been readily apparent to a reasonable licensed physician." (*See id.* at p. 8 of 15).

Mr. Boles also alleges in Claim One that Defendant Mallary, as the FCF Laundry and Food Services Manager, admitted to having authorized improper preparation of Kosher food and admitted to Mr. Boles that his indifference "was personal." (*See* SAC (doc. # 30) at p. 9 of 15).  Finally, Mr. Boles contends that Defendant Mallary ratified the constitutional violations of others by denying his grievances.  (*See* SAC (doc. # 30) at p. 9 of 15).

In Claim Two, Mr. Boles alleges that he has allergy symptoms consisting of a "profusely" runny nose, "[f]requent sneezing fits," clogged sinus and bronchial passages,

and itchy, irritated eyes. (*See* SAC (doc. # 30) at p. 10 of 15). Mr. Boles alleges that Defendant Walsh, a physician's assistant at FCF, was deliberately indifferent to symptoms that a layperson would have recognized as indicative of serious medical needs and which caused him substantial physical and psychological harm. (*See* SAC (doc. # 30) at p. 10 of 15). Mr. Boles alleges that Defendant Walsh denied him prescribed medications and access to qualified medical personnel, on non-medical grounds. (*See* SAC (doc. # 30) at p. 10 of 15). Mr. Boles contends that Defendant Walsh's "actions equate . .. to a wanton infliction of pain and suffering." (*See id.* at p. 10 of 15).

II.    Standard of Review

The purpose of a summary judgment motion is to assess whether trial is necessary. Rule 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The non-moving party has the burden of showing that issues of undetermined material fact exist. A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. These facts may be shown by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.

Summary judgment is also appropriate when the court concludes that no reasonable juror could find for the non-moving party based on the evidence presented in the motion and response. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. Summary judgment should not enter if, viewing the evidence in a light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. Unsupported allegations without any significant probative evidence tending to support the complaint are insufficient, as are conclusory assertions that factual disputes exist. Evidence presented must be based on more than mere speculation, conjecture, or surmise to defeat a motion for summary judgment. Nevertheless, summary judgment is inappropriate if disputes remain as to material facts.

*Nutting v. RAM Southwest, Inc.*, 106 F. Supp. 2d 1121, 1123 (D. Colo. 2000) (internal

quotation marks and citations omitted).

As the SAC has been sworn to under penalty of perjury (*see* doc. # 30 at p. 14 of 15), the court may treat it as an affidavit. *Green v. Branson*, 108 F.3d 1296, 1301 n. 1 (10th Cir. 1997). *See also Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) ("Although a nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e)."). "Rule 56(e) requires that the affidavit be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein." *Conaway*, 853 F.2d at 792.

Where the court treats a verified complaint as an affidavit, whether a party's affidavit in opposition to summary judgment is "sufficient to create a genuine issue of material fact must be evaluated in light of the principle that 'conclusory allegations without specific supporting facts have no probative value.' " *Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990) (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)). "[T]here may be cases where the sole reliance on a verified complaint would be insufficient to meet a nonmoving party's burden . . . , especially when the allegations contained in the pleading are merely conclusory." *Conaway*, 853 F.2d at 792-93. An affidavit merely stating conclusory allegations is insufficient to withstand a defendant's properly supported motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (quoting Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading")). The court must determine whether Mr. Boles has met his burden of presenting specific facts to overcome Defendants' Motion.

III.    Analysis

Mr. Boles sues Defendants in their individual capacities. (*See* SAC (doc. # 30) at pp. 2-3 of 15). Individual capacity suits pursuant to § 1983 seek to impose personal liability upon a government official for actions he takes under color of state law. *Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985). Section 1983 creates a cause of action where a "person . . . under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges or immunities secured by the Constitution." Section 1983 does not create any substantive rights; rather, it creates only a remedy for violations of rights secured by federal statutory and constitutional law. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 616-18 (1979). *See also Southern Disposal, Inc. v. Texas Waste Management*, 161 F.3d 1259, 1265 (10th Cir. 1998) ("In order to successfully state a cause of action under section 1983, [Mr. Boles] must allege . . . the deprivation of a federal right. . . .") (internal quotation marks and citation omitted). To establish a claim under § 1983, a plaintiff must prove he was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed under color of law. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).


A.    Treatment of Allergy Symptoms

Mr. Boles alleges that Defendant Walsh violated his Eighth Amendment rights by denying him medical treatment for his allergy symptoms. (*See* doc. # 30 at pp. 10-11 of 15). The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. Amend. VIII. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted). Certain conditions of

confinement, if they inflict pain unnecessarily and wantonly, may constitute cruel and unusual punishment under the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The Eighth Amendment prohibits prison officials from being deliberately indifferent to the serious medical needs of prisoners in their custody. *See Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment.") (internal quotation marks and citation omitted).

An Eighth Amendment claim involves "a two-pronged inquiry, comprised of an objective component and a subjective component." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir.), *cert. denied*, 549 U.S. 856 (2006). "Under the objective inquiry, the alleged deprivation must be sufficiently serious to constitute a deprivation of constitutional dimension." *Self*, 439 F.3d at 1230 (internal quotation marks and citation omitted). *See also Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (Eighth Amendment violation recognized only if medical needs are "serious"). Under the subjective inquiry, the defendant must have acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The subjective component follows from the principle that "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297). An inmate's complaint of inadequate medical care amounts to an Eighth Amendment claim if the inmate alleges "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106.

Deliberate indifference requires a higher degree of fault than negligence or even gross negligence. *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495-96 (10th Cir. 1990) (citation omitted). An official acts with deliberate indifference if his or her conduct "disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." *Berry*, 900 F.2d at 1496. The Supreme Court explained

the test for deliberate indifference:

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837.

Thus, in order to establish an Eighth Amendment claim that prison officials were deliberately indifferent to his medical needs, Mr. Boles must demonstrate that (1) he suffered objectively serious medical needs and (2) that the prison officials actually knew of and deliberately disregarded those needs. *See Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (two-pronged standard "requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious"); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (same) (citation omitted).

Defendant Walsh served as Boles' primary health care provider between September, 2004 and November, 2005. (*See* Affidavit of Michael Walsh (doc. # 157-3) at ¶ 7). Mr. Walsh personally examined Mr. Boles on September 21, 2004 and April 26, 2005. (*See* doc. # 157-3 at ¶ 8). Mr. Boles acknowledges that Mr. Walsh "saw me in his office twice." (*See* Response (doc. # 168) at p. 3). Mr. Walsh was scheduled to see Mr. Boles for medical appointments on November 10, 2004, June 17, 2005, July 26, 2005, and November 5, 2005, but Mr. Boles did not appear for those appointments. (*See id.* at ¶ 9; *see also* doc. # 157-3 at pp. 15-18 of 56).

On October 14, 2004, January 10, 2005, and April 12, 2005, Mr. Walsh prescribed Periactin, an oral antihistamine, to treat Mr. Boles' allergy symptoms. (*See* doc. # 157-3 at ¶¶ 12, 15-16; *see also* doc. # 157-3 at pp. 23-25 of 56). "Periactin is an appropriate treatment for allergies and allergy symptoms, including runny nose, frequent sneezing, itchy and irritated eyes, and clogged sinuses and bronchial passages." (*See id*, at ¶ 13). Mr. Boles did not request renewal of Periactin after April, 2005. (*See* doc. # 157-3 at ¶ 27).

In addition to prescribing oral antihistamines, Mr. Walsh also asked Mr. Boles whether he was interested in other treatments, such as an allergy shot, non-formulary nasal allergy spray, or non-formulary topical antihistamine. (*See id.* at ¶¶ 26, 29; *see also* doc. # 157-3 at p. 56 of 56). On July 11, 2005, Mr. Walsh prescribed Mr. Boles Hydroxyzine (also known as Vistaril), another oral antihistamine. (*See* doc. # 157-3 at ¶¶ 26, 28; *see also* doc. # 157-3 at p. 28 of 56).

Mr. Walsh "did not discontinue or deny Boles' prescription for Vasocon eye drops." (*See id.* at ¶¶ 26, 29). In late 2004 or early 2005, the CDOC's Non-Formulary Committee removed Vasocon from the CDOC's Formulary List. (*See* doc. # 157-3 at ¶ 20). As a result, Vasocon could no longer be prescribed without specific authorization from the Non-Formulary Committee. (*See id.* at ¶ 22; *see also* doc. # 157-3 at p. 14 of 56; doc. # 168 at p. 25 of 35). Mr. Walsh is "not a member of the CDOC's Non-Formulary Committee" and "was not involved in the Non-Formulary Committee's decision to remove Vasocon from the CDOC's Formulary List." (*See* doc. # 157-3 at ¶ 23). To the extent that Mr. Boles could no longer be prescribed Vasocon, Mr. Walsh "cannot be liable under § 1983 unless personally involved in the deprivation." *Olsen v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993). While Vasocon eye drops were removed from the CDOC's Formulary List, "the standard treatment for allergy symptoms is an oral allergy medication," which Mr. Boles received. (*See* doc. # 157-3 at ¶ 24).

Mr. Boles' allegations and evidence amount to no more than his disagreement with the treatment provided by Defendant Walsh. Mr. Boles did not find Mr. Walsh's explanations regarding medications "satisfactory." (*See* Response (doc. # 168) at p. 3). In Mr. Boles' opinion, "considering all of my known and recorded symptoms," Mr. Walsh should have suspected an "endocrin disease or glandular damage" and there are special tests that could have been done." (*See* Response (doc. # 168) at p. 4). As a layperson untrained in medicine, Mr. Boles is not qualified to determine the proper course of

treatment for his allergy symptoms or to contradict the medical evidence in the record. There is no evidence in the record to support Mr. Boles' allegation that Mr. Walsh is not a qualified medical provider (*see* doc. # 157-3 at ¶¶ 2-5) and the Eighth Amendment does not entitle Mr. Boles to the medical provider of his choice. *See Barrett v. Coplan*, 292 F. Supp. 2d 281, 285 (D.N.H. 2003) ("Adequate medical care requires treatment by qualified medical personnel who provide services that are of a quality acceptable when measured by prudent professional standards in the community, tailored to an inmate's particular medical needs, and that are based on medical considerations.") (internal quotation marks and citation omitted).

Whether a course of treatment is appropriate "is a classic example of a matter for medical judgment," that is insufficient to sustain a claim under the Eighth Amendment. *Estelle*, 429 U.S. at 107 (noting that medical decision to forego one form of treatment may be negligence but is not a constitutional violation). *See also Perkins v. Kansas Dept. Corrections*, 165 F.3d 803, 811 (10th Cir. 1999) ("[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation."); *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) ("[a] difference of opinion does not support a claim of cruel and unusual punishment"); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) ("Plaintiff's belief that he needed additional medication, other than that prescribed by the treating [medical provider] . . . is . . . insufficient to establish a constitutional violation.") (citations omitted); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (difference of medical opinion as to treatment of prisoner did not establish constitutional violation); *Ramos*, 639 F.2d at 575 (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation); *Henderson v. Secretary of Corrections*, 518 F.2d 694, 695 (10th Cir. 1975) ("The prisoner's right is to medical care -- not to the type or scope of medical care which he personally desires.") (internal quotation marks and citation omitted);

*Pressley v. Blaine*, 544 F. Supp. 2d 446, 454 (W.D. Pa. 2008). Mr. Boles' disagreement with his medical treatment cannot form the basis for relief pursuant to § 1983.

Further, Mr. Boles' opinion that the treatment he received was ineffective amounts to no more than an allegation of negligence. "'[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.'" *Green*, 108 F.3d at 1304 (citing *Estelle*, 429 U.S. at 106). For this reason also, Mr. Boles' difference of opinion about his medical treatment cannot form the basis for relief pursuant to § 1983.

To the extent that Mr. Boles claims that he was charged for not showing up for scheduled appointments (*see* doc. # 30 at p. 10 of 15), as long as an inmate's serious medical needs are met, "the Constitution does not dictate how the cost of that care should be allocated as between the entity and the provider of the care." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 245 (1983). "Under CDOC policy, inmates are charged a co-pay for 'no shows' to scheduled appointments (unless the inmate submits a written cancellation request before the date of the appointment)." (*See* doc. # 157-3 at ¶ 10). The CDOC's co-pay policy has been upheld. *See Negron v. Gillespie*, 111 P.3d 556, 558 (Colo. App. 2005).

There is no objective evidence to support Mr. Boles' allegation that Mr. Walsh denied him medical treatment because of his "heritage." (*See* doc. # 30 at p. 10 of 15). The evidence indicates that Mr. Walsh consistently provided Mr. Boles medical treatment and medications for his allergies and allergy symptoms. (*See id.* at ¶¶ 7-8, 11-12, 15-17, 24, 27-29). The medical records also corroborate the medical care and treatment Mr. Boles received for his allergy symptoms. Mr. Boles' claim against Defendant Walsh consists of no more than conclusory allegations. (*See* Response (doc. # 168) at p. 4) (Mr. Boles "firmly believe[s] Mr. Walsh made his treatment decisions for me based on prejudiced presumptions rather than medical evaluations."). Mr. Boles' grievances present only

conclusory allegations without specific supporting facts and are not sufficient to create a genuine issue of material fact. (*See, e.g.*, doc. # 169 at p. 7 of 20; doc. # 168 at pp. 29-31 of 35). Mr. Boles has made no showing that the course of treatment provided by Defendant Walsh so deviated from the standard of care as to reflect deliberate indifference. *See Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (plaintiff entitled to prove his case by establishing that doctor's "course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference in violation of his eighth amendment right to be free from cruel and unusual punishment."). Mr. Boles has not presented sufficient evidence to refute Defendants' evidence that "[a]ll of [Mr. Walsh's] treatment decisions regarding Boles were based on [Mr. Walsh's] objective evaluation of [Boles'] medical needs." (*See* doc. # 157-3 at ¶ 55). "The record does not even approach establishing a denial of adequate medical care, much less an issue relating to a culpable state of mind, *i.e.*, a deliberate indifference . . . to . . . medical conditions." *Handy v. Price*, 996 F.2d 1064, 1067 (10th Cir. 1993). Mr. Walsh is entitled to summary judgment on the SAC.

B.    Therapeutic Snacks

Mr. Boles alleges that Defendants Dansdill and Creany violated his Eighth Amendment rights by discontinuing his therapeutic snacks. (*See* doc. # 30 at pp. 5-9 of 15). During the time period relevant to Mr. Boles claims, Defendant Dansdill supervised the Food Services Department at FCF and Defendant Creany was a physician at FCF. Mr. Boles alleges that Defendants Dansdill and Creany interfered, canceled, or conspired to cancel his therapeutic snacks in April, 2004. (*See* doc. # 30 at pp. 6, 8 of 15).

In October, 2001, a dietician issued an order for Mr. Boles to receive therapeutic snacks. (*See* Affidavit of Dr. Timothy Creany (doc. # 157-2) at ¶ 13 and pp. 8-9 of 14; Response to Interrogatory #1 (doc. # 157-9) at pp. 6-7 of 13; doc. # 168 at p. 23 of 35).

That order expired in October, 2002 and was not renewed. (*See* doc. # 157-2 at ¶ 16).

While that order was never renewed, Mr. Boles continued to receive therapeutic snacks.

In April, 2004, Mr. Boles complained to Defendant Dansdill that his therapeutic snacks were

not being properly prepared. (*See* Affidavit of Richard Dansdill (doc. # 157-5) at ¶ 46). In

investigating Mr. Boles' complaints, Mr. Dansdill discovered that Mr. Boles did not have any

current valid order for therapeutic snacks. (*See id.*; *see also* doc. # 157-5 at ¶ 46; doc. #

168 at p. 16 of 35; doc. # 169-2 at pp. 10-12 of 16). "Without a valid written medical order

for a snack, [Food Services] cannot prepare and issue that snack to an inmate." (*See* doc.

# 157-5 at ¶ 51 (quoting Information Resolution Attempt, FF03/04-500 (doc. # 157-5 at p.

50 of 52); doc. # 157-5 at ¶¶ 41-43). In April, 2004, Mr. Dansdill advised Mr. Boles to

contact Clinical Services to request a new order for therapeutic snacks. (*See* doc. # 157-5

at ¶¶ 46, 47, 52, p. 49 of 52; *see also* doc. # 168 at p. 17 of 35; doc. # 169-2 at p. 10 of 16).

Mr. Boles did not request Clinical Services to order him snacks in April, 2004. (*See* doc.

# 157-2 at ¶ 18). Because there was no valid medical order for Mr. Boles to receive

therapeutic snacks in April, 2004, and because Clinical Services did not issue a new order

for snacks, Food Services stopped preparing therapeutic snacks for Mr. Boles at the end

of April, 2004. (*See* doc. # 157-5 at ¶ 49).

On May 11, 2004, after Mr. Boles had been "[o]ff snacks for 2 weeks now," he had

had "no episodes . . . suggestive of hypoglycemia." (*See* doc. # 157-2 at ¶ 21 (quoting

Amb. Rec., 5/11/04 (doc. # 157-2 at p. 11 of 14)). On June 29, 2004, a registered dietician

noted that Mr. Boles "nutritionally appears stable @ this time" and "@ this time no need for

snacks." (*See id.* at ¶ 23 (quoting Consultation Report From, 6/8/04 (doc. # 157-2) at p.

13 of 14)). The results of a four-hour glucose tolerance test administered on July 26, 2004

test suggested Mr. Boles had reactive hypoglycemia. (*See* doc. # 157-2 at ¶ 24). On July

29, 2004, a Nurse Practitioner ordered that Mr. Boles receive American Diabetes

Association ("ADA") snacks three times per day. (*See id.* at ¶ 25; doc. # 168 at p. 28 of

35). Thus, Mr. Boles had not received therapeutic snacks for three months between April 28, 2004 and July 29, 2004. (*See* doc. # 30 at p. 6 of 15; doc. # 157-2 at ¶ 25).

The evidence does not support Mr. Boles' allegations against Defendants Dansdill and Creany. Dr. Creany "did not cancel Boles' therapeutic diet snacks in April, 2004—or any other time." (*See* doc. # 157-2 at ¶ 9). Mr. Dansdill "did not cancel Boles' therapeutic snack." (*See* Affidavit of Richard Dansdill (doc. # 157-5) at ¶ 50; Affidavit of Thomas Mallary (doc. # 157-4) at ¶ 33). Dr. Creany and Mr. Dansdill did not conspire to cancel Mr. Boles' therapeutic snack. (*See* doc. # 157-2 at ¶ 10; doc. # 157-5 at ¶ 50). While Mr. Boles had a medical order for therapeutic snacks in October, 2001, that order had expired. As no valid medical order for snacks was in effect in April, 2004, Defendants did not interfere with any prescribed treatment. It was not unconstitutional for Mr. Dansdill to direct Mr. Boles' medical request for snacks to Clinical Services. *See Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (non-medical staff are entitled to rely on the professional judgment of prison medical staff); *Shelton v. Angelone*, 148 F. Supp. 2d 670, 678 (W.D. Va. 2001) ("Prison personnel may rely on the opinion os the medical staff as to the proper course of treatment.") (citation omitted). When the results of the glucose tolerance test confirmed a diagnosis of reactive hypoglycemia, Mr. Boles received a new order for therapeutic snacks.

The evidence does not show a conscious disregard by Defendants to a substantial risk of serious harm to Mr. Boles. *See Berry*, 900 F.2d at 1495-96 (An official acts with deliberate indifference if his or her conduct "disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights."). Even in light of the glucose tolerance test, it was Dr. Creany's opinion that Mr. Boles did not require therapeutic snacks. (*See id.* at ¶¶ 19, 26). In Dr. Creany's "medical opinion, the better treatment option would have been for Boles to eat smarter: eat his entire meal, stop skipping meals, limit intake of simple sugars such as soda, deserts, and fruits, and instead eat more protein." (*See* doc. # 157-2 at ¶ 26). Mr. Boles argues that Dr. "Creany's failure to employ a

professionally acceptable standard of care is self evident" and that Dr. Creany "offers opinions that are absurd." (*See* doc. # 168 at pp. 8, 11 of 35). "[A] mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment." *Ramos*, 639 F.2d at 575. "Medical decisions that may be characterized as 'classic examples of matters for medical judgment,' such as whether one course of treatment is preferable to another, are beyond the [Eighth] Amendment's purview." *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006) (internal quotation marks and citation omitted).

As to Mr. Boles' allegation that Dr. Creany did not follow the professional judgment of his predecessor, (*see* doc. # 30 at p. 8 of 15), "[a] prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment." *Callahan*, 471 F.3d at 1160 (internal quotation marks and citation omitted). "[T]hat another physician in the same circumstance might have ordered different tests and treatment" does not show deliberate indifference. *Noll v. Petrovsky*, 828 F.2d 461, 462 (8th Cir. 1987).

Mr. Boles' allegation that Dr. Creany failed to diagnose his hypoglycemia (*see* doc. # 30 at p. 8 of 15; doc. # 157-9 at p. 9 of 13) raises no more than a claim for negligence. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

Mr. Boles has not met his burden of demonstrating that the three-month delay in re-prescribing him therapeutic snacks caused him any harm. The medical evidence indicates "no evidence that Mr. Boles' hypoglycemia has progressed into diabetes or otherwise worsened since April, 2004." (*See* doc. # 157-2 at ¶ 27; *see also* Response (doc. # 168) at p. 7 of 35 ("There may not yet be any confirmation that my condition has advanced to diabetes. But there is no evidence that it hasn't either.")). Only delays that

result in "substantial harm" violate the Eighth Amendment. *See Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (delay in providing medical care to a prisoner constitutes an Eighth Amendment violation only if it results in substantial harm) (citing *Olsen v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (18 month delay for elective heart surgery did not violate Eighth Amendment)); *White v. State of Colorado*, 82 F.3d 364, 366-67 (10th Cir. 1996) (two-year delay in surgery on inmate's leg did not violate the Eighth Amendment because the delay caused no further damage to the leg). Other than his own lay opinion, Mr. Boles has presented no evidence that therapeutic snacks were medically necessary between April 28, 2004 and July 29, 2004.

As to Mr. Boles' allegation that Defendants retaliated against him for his complaints, "[a]n inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (internal quotation marks and citation omitted). "[A] plaintiff must prove that but for the retaliatory motive, the incidents to which he refers, . . . would not have taken place." *Id*. This claim also fails based on the lack of evidence of any improper basis for discontinuing Mr. Boles' therapeutic snacks for three months.

In sum, the evidence does not show that Defendants Dansdill and Creany were deliberately indifferent to Mr. Boles' serious medical need in violation of the Eighth Amendment.

C.     Kosher Food Preparation

Mr. Boles alleges that Defendants Dansdill, Peoples, and Mallary violated his First Amendment rights by failing to provide proper kosher food preparation. (*See* doc. # 30 at pp. 5-9 of 15). During the time period relevant to Mr. Boles' claims, Defendant Dansdill supervised the Food Services Department at FCF, Defendant Peoples was the Food Services Lieutenant at FCF, and Defendant Mallary was the Support Services Manager and

the Programs Manager at FCF.

"Inmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). The Tenth Circuit has recognized "that prisoners have a constitutional right to a diet conforming to their religious beliefs." *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002). The burden is on Mr. Boles to prove that the Defendants' conduct was unconstitutional. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Mr. Boles alleges that Defendant Peoples caused his kosher food and snacks to "become non-kosher" and to "deviate from the prescribed diet." (*See* doc. # 30 at pp. 5, 7 of 15). The CDOC provides kosher meals to Jewish inmates. (*See* doc. # 157-4 at ¶ 4; doc. # 157-5 at ¶¶ 3, 5; Affidavit of Charles Peoples (doc. # 157-6) at ¶ 3). The CDOC's kosher meal program was developed with The Scroll K, a kosher certification agency. (*See* doc. # 157-4 at ¶ 6; doc. # 157-5 at ¶ 6; doc. # 157-6 at ¶ 5). "The Scroll K is a non-profit kosher (Kashrus) certification agency" that operates as a consultant to the CDOC. (*See* Affidavit of Rabbi Yisroel Rosskamm (doc. # 157-8) at ¶¶ 2-3; Affidavit of Dona Zavislan (doc. # 157-7) at ¶ 4). The Scroll K "reviews the CDOC's kosher guidelines and menus." (*See* doc. # 157-8 at ¶ 3; doc. # 157-7 at ¶ 4). "FCF Food Services prepares kosher food in accordance with the kosher guidelines provided by CDOC Headquarters as well as the guidance of the rabbinical advisors from The Scroll K." (*See* doc. # 157-4 at ¶ 8; doc. # 157-5 at ¶¶ 8-9; doc. # 157-6 at ¶ 7). During the relevant time period, Rabbi Rosskamm and Rabbi Erlanger from The Scroll K repeatedly concluded that FCF's kosher preparation area was satisfactory and that FCF Food Services was properly following Scroll K guidelines for kosher food preparation. (*See* doc. # 157-4 at ¶¶ 11-12; doc. # 157-5 at ¶¶ 13, 16-17; doc. # 157-6 at ¶¶ 9-10, 16; doc. # 157-7 at ¶¶ 15-24; doc. # 157-8 at ¶¶ 6-9). "FCF's kosher preparation area is well set up and meets Scroll K guidelines." (*See* doc.

# 157-8 at ¶ 4). Mr. Boles alleges that "[t]o date, no aspect of the food service at FCF has ever been certified Kosher by any Rabbi." (*See* doc. # 30 at p. 9 of 15). Mr. Boles fails to make a minimal showing of the evidence with which he will prove this claim.

Mr. Boles alleges that "preparers deviat[ed] from the prescription for the plaintiff's snacks" by serving "smelly eggs" and "rotten fruit." (*See* doc. # 30 at pp. 5, 7 of 15). Due to Passover's special dietary restrictions, some Jewish inmates may not be able to eat their regular therapeutic snack during Passover for religious reasons. (*See* doc. # 157-6 at ¶ 30). "FCF Food Services follows the Passover Menu when preparing and providing substitute medical snacks during Passover." (*See* doc. # 157-6 at ¶ 30). The Passover Menu prepared by Ms. Zavislan and approved by Rabbi Rosskamm, lists acceptable substitute snacks. (*See* doc. # 157-6 at ¶ 30; doc. # 157-7 at ¶ 9). In 2004 and 2005, the approved substitute snack described in Passover Menu was two hard cooked eggs (or tuna fish), Matzah, and fresh fruit. (*See* Passover Menu 2004 (doc. # 157-7 at p. 21 of 47); Passover Menu 2005 (doc. # 157-7 at p. 36 of 47)).

There is no evidence that Defendants Mallary, Dansdill, or Peoples ever knowingly served bad or rotten food. (*See* doc. # 157-4 at ¶¶ 5, 19; doc. # 157-5 at ¶¶ 4, 24; doc. # 157-6 at ¶¶ 4, 18). If any bad or rotten was inadvertently served, FCF Food Services would exchange it. (*See* doc. # 157-4 at ¶ 19; *See* doc. # 157-5 at ¶ 25; *See* doc. # 157-6 at ¶ 18). Defendant Peoples "never ordered kosher food preparers to deviate from the prescription for Boles' therapeutic diet snacks. As long as the diet food items listed on the diet ticket were available, those specific diet food items were provided." (*See* doc. # 157-6 at ¶ 32). Defendant Dansdill "never gave Lt. Peoples authorization to deviate from any valid medical order for snacks" or "to act in a manner causing kosher food to become non-kosher." (*See* doc. # 157-5 at ¶¶ 26, 45). The evidence before the court indicates that FCF provided an appropriate Kosher program that met all the requirements of the Jewish faith and that occasional problems were handled in an appropriate and timely fashion.

(*See, e.g.*, doc. # 157-4 at ¶¶ 10-16; doc. # 157-5 at ¶¶ 5-21; doc. # 157-6 at ¶¶ 12-15).

Mr. Boles' allegations of improper handling of the kosher food are merely conclusory and are insufficient to demonstrate a constitutional violation. While Mr. Boles generally complains that his food was not properly prepared to meet kosher standards, he does not adequately allege specific dates or instances. (*See, e.g.*, doc. # 169 at p. 20 of 20; doc. # 169-2 at pp. 2-3, 6, 13-16 of 16). Mr. Boles argues that

> Rabbis don't inspect every can of food or facility uses. They aren't there every day. They never see what is actually served as it is being served. Gentiles will be Gentiles they will circumvent the guidelines when ever it is quicker, easier, or they perceive some advantage to themselves [sic].

(*See* doc. # 168 at p. 9 of 35; *see also* doc. # 169-2 at p. 7 of 16 ("Evidence strongly supports our suspicion that Kosher law is not being kept on purpose."). Mr. Boles further responds that "if I were informed a Rabbi inspected the kosher preparation areas before Passover[,] such information would be a lie." (*See* doc. # 157-9 at p. 11 of 13). While the court must view the evidence and draw all inferences in the light most favorable to the party opposing summary judgment, general averments do not necessarily contain the specific facts needed to sustain a claim. *See Lujan*, 497 U.S. at 888 ("[O]nly in the sense that, where the facts specifically averred by [the non-moving party] contradict facts specifically averred by the movant," must the motion be denied.). Mr. Boles' allegations of unsatisfactory food and personal suspicions of improper food preparation are merely general averments stating conclusory allegations that are insufficient to withstand Defendants' motion for summary judgment.

Mr. Boles further alleges that Defendants Mallary, Dansdill, and Peoples allowed FCF's Kosher preparation area to not be properly kashered prior to Passover 2004, thus causing all food to be non-kosher or unfit for Passover consumption. (*See* doc. # 30 at pp. 5, 6, 9 of 15). The CDOC provides special meals and accommodations to Jewish inmates during Passover. (*See* doc. # 157-4 at ¶ 21; doc. # 157-5 at ¶ 29; doc. # 157-6 at ¶ 19; doc. # 157-7 at ¶ 6; doc. # 157-8 at ¶ 13). In 2004, Passover occurred from April 5, 2004,

to April 13, 2004. (CDOC Passover Guidelines 2004 at 1 (doc. # 157-7 at p. 7 of 47)). In 2005, Passover occurred from April 24, 2005, to May 1, 2005. (CDOC Passover Guidelines 2005 at 1 (doc. # 157-7 at p. 23 of 47)). Mr. Boles participated in Passover in 2004 and 2005. (*See* doc. # 157-6 at ¶ 23). Dona Zavislan, CDOC's Food Service and Laundry Programs Manager, is responsible for implementing guidelines for religious diets, including the kosher diet. (*See* doc. # 157-4 at ¶ 7; doc. # 157-5 at ¶ 8; doc. # 157-6 at ¶ 6; doc. # 157-7 at ¶ 3). Every year Ms. Zavislan prepares comprehensive Passover Guidelines, a Passover Menu, and training to guide the individual facilities in providing adequate meals and accommodations to Jewish inmates during Passover. (*See* doc. # 157-4 at ¶¶ 22-23; doc. # 157-5 at ¶¶ 31-32; doc. # 157-6 at ¶¶ 20-21; doc. # 157-7 at ¶¶ 8-9, 11-12; doc. # 157-8 at ¶¶ 14-15). Rabbi Rosskamm reviews and approves the Passover Guidelines and Passover Menu. (*See* doc. # 157-7 at ¶¶ 8, 10; doc. # 157-8 at ¶ 14). Among other things, the Passover Guidelines describe how to properly prepare the kosher preparation area prior to Passover. (*See* doc. # 157-8 at ¶ 17). Any chometz (food which cannot be eaten during Passover) must be removed from the kosher preparation area. (*See id.*; doc. # 157-5 at ¶ 35). If a microwave or electric steamer will be used to prepare Kosher meals, the microwave or electric steamer should be kashered prior to Passover. (*See* doc. # 157-8 at ¶ 17). The evidence indicates that "FCF's kosher preparation area was properly kashered prior to Passover in 2004." (*See* doc. # 157-4 at ¶ 29; doc. # 157-5 at ¶ 39; doc. # 157-6 at ¶ 27).

As to Mr. Boles' objection to the personnel working in the kitchen, "[t]he facilities are not required to allow Jewish inmates to participate in the cleaning of the food preparation area prior to Passover. Preparation of the Kosher preparation area prior to Passover may be done by CDOC staff or non-Jewish inmates." (*See id.* at ¶ 18; *see also* doc. # 157-4 at ¶ 25). While not required to do so, FCF Food Services allowed a Jewish inmate to assist with the pre-Passover kashering of the kosher preparation area in 2004. (*See* doc. # 157-5

at ¶ 35; doc. # 157-4 at ¶ 26).

Mr. Boles also claims that, prior to Passover 2005, he learned that "DOC accommodations for [Passover 2005] . . . would be a sham and abomination." (*See* doc. # 30 at p. 7 of 15).  Mr. Boles seems to complain that the Passover meals in 2005 were only served in the "holiday observance area" and not in the chow hall.  (*See* doc. # 30 at p. 7 of 15).  Each facility designates a specific area of the facility, separate from the normal dining area, where Jewish inmates participating in Passover will eat their Passover meals. (*See* doc. # 157-8 at ¶ 16).  This was pursuant to the Passover Guidelines approved by Rabbi Rosskamm.  "Under the Passover Guidelines, each facility needs to designate a specific area of the facility separate from the normal dining area where Jewish inmates participating in Passover will eat their Passover meals."  (*See* doc. # 157-8 at ¶ 16). "During Passover, the dining room is not an appropriate place for meal service due to their being chometz in the area." (Passover Guidelines 2005 at XVI(B) (doc. # 157-7 at p. 33 of 47)).  In 2004 and 2005, the Passover meals for Orthodox Jewish inmates were served in FCF's multi-purpose room MPR2E.  (*See* doc. # 157-6 at ¶ 26).  FCF was not required to serve Passover meals in multiple locations.  *See O'Lone*, 482 U.S. at 348 (An inmate's free exercise rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security.").  *See also Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) (in the First Amendment context "some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system'") (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  It was not unconstitutional that where "there was a difference between [Boles'] demands and the specific guidance provided by [the] rabbinical advisors, [Defendants] follow[ed] the rabbi's guidance."  (*See* doc. # 157-4 at ¶ 16; doc. # 157-5 at ¶ 21; doc. # 157-6 at ¶ 15).  While Mr. Boles claims he was forced "to attend a religious function in which he did not believe," he does not identify how Passover 2005 was "a sham and

abomination." FCF Food Services followed the Passover Guidelines and Passover Menu in 2004 and 2005. (*See* doc. # 157-4 at ¶¶ 22, 29, 34; doc. # 157-5 at ¶¶ 38, 55; doc. # 157-6 at ¶¶ 25, 27, 34). "If FCF Food Services followed the Passover Guidelines and Passover Menu in 2004 and 2005, then FCF's Passover meals and accommodations should have been satisfactory." (*See* doc. # 157-8 at ¶ 20). Mr. Boles' unsupported, conclusory allegation is insufficient to state a claim or survive summary judgment. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). There is no evidence that the provisions for Passover 2004 or 2005 violated Mr. Boles First Amendment rights.

To the extent that Mr. Boles is alleging that Defendants Mallary, Dansdill, or Peoples acted negligently in conducting or supervising the pre-Passover kashering of FCF's kosher preparation area, allegations of negligence are not cognizable in a § 1983 claim. *See Benglen v. Zavaras*, 7 F. Supp. 2d 1171, 1176 (D. Colo. 1998) ("At most these allegations assert a claim for negligence, which is not cognizable under § 1983.").

Mr. Boles further attempts to hold Defendant Mallary liable on the basis that he denied grievances. (*See* doc. # 30 at p. 9 of 15). However, without an allegation of direct responsibility for the alleged violations, Defendant Mallary cannot be held liable for an alleged constitutional violation on the basis that he denied a grievance. *See, e.g., Downing v. Clinton*, 2006 WL 3054314, *15 (E. D. Wash. 2006) (in granting motion to dismiss, held that defendant's receipt of grievances did not establish her personal participation in decisions relating to medical care); *Johnson v. G.E.O./Lawton Correctional Facility*, 2005 WL 2739212 (W.D. Okla. 2005) (holding that plaintiff failed to state a claim for relief based upon a defendant's participation in the processing of a grievance; *pro se* plaintiff had not demonstrated the required "affirmative link" between the defendant and the underlying constitutional violation); *Coates v. Sheahan*, 1995 WL 430950, *2 (N.D. Ill. 1995) (holding that grievances submitted to a supervisory official are insufficient to establish that official's

personal participation in a constitutional violation).[4] There is no basis for holding Defendant Mallary liable under § 1983 for the denial of grievances.

## D.    Qualified Immunity

Defendants raise the defense of qualified immunity.   Whether Defendants are entitled to qualified immunity is a legal question.  *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007), *cert. denied*, 128 S.Ct. 1229 (2008).

> When [a defendant] asserts a defense of qualified immunity, the plaintiff bears a heavy two-part burden.  Initially, the plaintiff must show the [defendant]'s conduct violated a constitutional right: A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant]'s conduct violated a constitutional right?

*Wilder v. Turner*, 490 F.3d at 813 (internal quotation marks and citations omitted).  *See also Wilson v. Layne*, 526 U.S. 603, 609 (1999) (a court evaluating a claim of qualified immunity "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.") (citation omitted);  *Butler v. City of Prairie Village, Kansas*, 172 F.3d 736, 745 (10th Cir. 1999) (court "must first determine 'whether the plaintiff has sufficiently alleged that the defendant violated a statutory or constitutional right' . . . If the plaintiff has asserted such a deprivation, *only then* do we inquire 'whether the right was clearly established such that a reasonable person in the defendant's position would have known that his or her conduct violated that right' ") (citation omitted).

Having concluded above that Mr. Boles has failed to state a claim that Defendants' conduct violated his constitutional rights, "the inquiry ends and the [defendants are] entitled to qualified immunity."  *Wilder v. Turner*, 490 F.3d at 813 (citation omitted).

---

[4]    Copies of these unpublished cases are attached to this Recommendation.

E.    Compensatory Damages

As the court has determined that Mr. Boles has not met his burden on summary judgment as to any of this claims, it need not reach Defendants' argument that Mr. Boles has not alleged a physical injury as required by 42 U.S.C. § 1997e(e).

Accordingly, IT IS RECOMMENDED that Defendants' Motion for Summary Judgment (filed June 2, 2008) (doc. # 157) be GRANTED and that summary judgment be entered on the Second Amended Complaint (doc. # 30) in favor of Defendants and against Mr. Boles, with each party to pay his own costs and fees.

**Advisement to the Parties**

Within ten days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an

objection does not preclude application of the "firm waiver rule");  *One Parcel of Real Property*, 73 F.3d at 1059-60 (a party's objections to the Magistrate Judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the District Court or for appellate review);  *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 11th day of December, 2008.

BY THE COURT:


____s/Craig B. Shaffer_____
United States Magistrate Judge